# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ANTON GABLE OWINGS,    )
            )
    **Plaintiff,**    )
            )   **No. 3:14-01066**
**v.**           )   **Judge Nixon/Brown**
            )
CAROLYN W. COLVIN,    )
ACTING COMMISSIONER   )
OF SOCIAL SECURITY,    )
            )
    **Defendant.**   )

**To: The Honorable John T. Nixon, Senior United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on October 6, 2010 alleging a disability onset date of June 15, 2007. (Doc. 10, pp. 78, 103-04)[1] Plaintiff's last insured date was September 30, 2009. (Doc. 10, pp. 30, 104, 141, 148) Plaintiff claimed to be unable to work because of diabetes, heart problems, back and foot pain, and nerve problems. (Doc. 10, pp. 30, 108) Plaintiff's application was denied

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the page numbers that appear in **bold** in the upper right corner of each page.

initially on March 7, 2011, and upon reconsideration on May 10, 2011. (Doc. 10, pp. 24-30, 37)

Plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 10, pp. 38-39) A hearing was held on November 9, 2012 in Nashville before ALJ David Ettinger. (Doc. 10, pp. 573-611) Vocational expert (VE) Gary Sturgill testified at the hearing. (Doc. 10, pp. 573, 604-610) Plaintiff was represented at the hearing by an attorney. (Doc. 10, pp. 573, 575-76)

The ALJ entered an unfavorable decision on February 1, 2013. (Doc. 10, pp. 10-23) Plaintiff filed a request with the Appeals Council on February 28, 2013 to review the ALJ's decision. (Doc. 10, p. 9) The Appeals Council denied plaintiff's request on February 26, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 5-7)

Plaintiff brought this action through counsel on April 25, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on September 22, 2014 (Doc. 14), the Commissioner responded on November 19, 2014 (Doc. 18), and plaintiff replied on December 3, 2014 (Doc. 19). This matter is now properly before the court.

## II. REVIEW OF THE RECORD[2]

### A. Medical Evidence

Dr. Michael Littiff, D.O., treated plaintiff from April 2004 until May 2008. (Doc. 10, pp. 174-224) A March 21, 2005 progress note shows that plaintiff hurt his back when he "fell through cracks in [a] press stand @ work" on March 16, 2005. (Doc. 10, p. 202) Apart from this single notation, Dr. Littell's progress notes are silent as to any further back-related pain.

As for plaintiff's diabetes, Dr. Littell reported on September 28, 2007 that plaintiff was "self adjusting insulin," and instructed him "not [to] self adjust [but] take as RXed." (Doc. 10, p. 179)

---

[2] The excerpts of the medical record and hearing addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the medical evidence of record and transcript of the hearing is incorporated herein by reference.

A progress note dated November 17, 2007 reports that plaintiff has "not been able to afford pills" (Doc. 10, p. 187), and another dated November 5, 2007 reports that plaintiff refused the HBA1C test[3] (Doc. 10, p. 176).

Doctor Littell's November 26, 2007 progress note reports that plaintiff injured his foot on November 8, 2007 while working. (Doc. 10, p. 175) X-rays revealed "[s]oft tissue swelling without fracture . . . [otherwise a] . . . [n]ormal [s]tudy." (Doc. 10, pp. 210-11)

Plaintiff was treated by Dr. Lu Ponce, M.D., from March 22, 2005 to August 16, 2012. (Doc. 10, pp. 269-326, 413-432, 491-564) A March 22, 2005 progress note shows that plaintiff fell while working at UniPress "last Wed," *i.e.*, on March 16th, and injured his back. (Doc. 10, p. 308) Apart from this initial notation, Dr. Ponce's records consistently show plaintiff's musculoskeletal system within normal limits, including gait, range of motion, joint stability, strength, etc. (Doc. 10, pp. 269, 271, 273, 276, 278, 280, 283, 285, 287, 290, 292, 294, 299-302, 304-05)

Dr. Ponce's records also note the following during the nearly 3 year period from October 2008 through July 2011: 1)"It seems that he has always been economizing on his insulin . . . [and] . . . his diabetes is not under good control" (Doc. 10, p. 300); 2) "Patient is taking Metformin. It makes him sick." (Doc. 10, p. 292); 3) plaintiff canceled 5 consecutive monthly diabetic appointments (Doc. 10, pp. 282, 289); 4) "Pt. left w/out being seen – Did not want to wait (There was only 1 Pt. In front of him & it was a quick sick re-✓.)" (Doc. 10, pp. 275, 519); 5) "has not been taking insulin as directed . . . ." (Doc. 10, p. 269);6) "not the most compliant pt." (Doc. 10, pp.427-28); 7) "he is not fully compliant" (Doc. 10, p. 421).

The records of Dr. Roy Terry, M.D., show that he performed a "L4-L5 lumbar herniated disc

---

[3] HBA1C is used for "[e]valuating the long-term control of blood glucose concentrations in diabetic patients." www.mayomedicalcallaboratories.com/test-catalog/Clinical+and+Interpretive/82080.

excision with laminectomy L5 and foraminotomy"[4] on plaintiff July 8, 2005 following plaintiff's fall at UniPress in March that year. (Doc. 10, pp. 155-56, 172) Doctor Terry saw plaintiff several times between April 2005 and November 2005, but not thereafter. (Doc. 10, pp. 155-73 ) Doctor Terry wrote the following on November 15, 2005:

> Patient is on permanent restrictions. He has back pain. . . . The gentleman has been released from our care at this point. He has a MRI study showing what appears to be no evidence of any compression of the nerves that appeared significant. . . . We will have him do no repetitive bending or twisting but, otherwise, he can do his regular duty type work. . . . .

(Doc. 10, p. 162)[5]

Doctor James Yu, M.D., performed a "[r]ight ankle arthroscopy with extensive debridement"[6] on plaintiff on April 16, 2008. (Doc. 10, p. 230) In an earlier report, Dr. Yu noted that plaintiff's foot/ankle related injury occurred "at work on 11/09/2007." (Doc. 10, p. 245) In his final report dated November 6, 2008, Dr. Yu noted that plaintiff:

> has excellent subtalar and relatively normal ankle range of motion except for slightly decreased dorsiflexion. Inversion and plantar flexion strength remains at 4/5.[7] He does walk with a mild limp. The remainder of the examination was unremarkable.

---

[4] Laminectomy – "excision [removal of a portion or all of an organ or other structure] of the posterior arch of a vertebra." *Dorland's Illustrated Medical Dictionary* 1003 (32nd ed. 657, 2012). Foraminotomy – "the operation of removing the roof of intervertebral foramina [a natural opening or passage through the bone], done for the relief of nerve root compression." *Dorland's* at pp. 729, 731.

[5] Doctor Terry wrote another report (Doc. 10, p. 163) – also dated November 15, 2005 – that is very similar to the one quoted above. The Magistrate Judge concludes that the report quoted above is the later report, because Dr. Terry states in it: "The Gentleman has been released from our care at this point."

[6] Arthoscopy – "examination of the interior of a joint with an arthoscope." *Dorland's* at p. 158. Debride – "to remove foreign material and contaminated . . . tissue . . . ." *Dorland's* at p. 473.

[7] Subtalar – "inferior [lower] to the talus [ankle]." *Dorland's* at pp. 935, 1794, 1870. Dorsiflexion – "flexion or bending toward the extensor [any muscle that extends a joint] aspect of a limb, as of the hand or foot." *Dorland's* at pp. 563, 663. Inversion – "a turning inward, inside out, upside down, or other reversal of the normal relation of a part." *Dorland's* at p. 956. Plantar – "the undersurface of the foot." *Dorland's* at p. 1455.

(Doc. 10, p. 225)  Plaintiff's "permanent restrictions include[d] alternate sitting and standing every 30 minutes and no ladders."  (Doc. 10, p. 225)

Plaintiff was treated at the Sumner Regional Medical Center (Sumner Regional) emergency room (ER) on August 11, 2008 for chest pain and "some shortness of breath."  (Doc. 10, pp. 385-86)  Two months later, on October 28, 2008, plaintiff had 2 stents implanted in his right coronary artery (RCA) at the Hendersonville Medical Center.  (Doc. 10, p. 485)  The cardiologist's impression post-procedure was severe single vessel disease . . . [and] . . . mild multi-vessel disease."  (Doc. 10, p. 485)  Plaintiff presented to the Tennessee Heart and Vascular Institute (Tennessee Heart) for a followup on November 5, 2008 at which time plaintiff reported that his condition was improving with the current therapy.  (Doc. 10, p. 260)

Plaintiff was treated again for chest pain at the Sumner Regional ER on January 7, 2009.  (Doc. 10, pp. 393-96)  An electrocardiogram was normal with no acute ischemic changes; laboratory analysis and xrays were unremarkable as well.  (Doc. 10, p. 378)  The symptoms were "very atypical for ischemic heart disease," and deemed not cardiac related.  (Doc. 10, p. 379)

On July 2, 2009, plaintiff presented to Tennessee Heart after having been hospitalized for "[s]ymptomatic premature ventricular contractions, no myocardial infarctions."  (Doc. 10, p. 255)  Plaintiff reported that his symptoms had improved with his current therapy, and since he decreased his caffeine and nicotine intake.  (Doc. 10, p. 255)  On October 29, 2009, plaintiff again reported that his symptoms were improving.  (Doc. 10, p. 250)

Doctor Albert Gomez, M.D., examined plaintiff consultively on January 12, 2011.  (Doc. 10, pp. 327-30)  Doctor Gomez reported that plaintiff "denie[d] any history of diabetic retinopathy."  (Doc. 10, p. 327)  Doctor Gomez reported that plaintiff appeared in no acute distress, had a normal gait, and got on and off the examination without difficulty.  (Doc. 10, p. 328)  Regarding plaintiff's

back, Dr. Gomez reported that "[t]here was no tenderness to palpation of the lumbar spine . . . [and] . . . full range of motion." (Doc. 10, p. 329) Doctor Gomez also reported that plaintiff could "squat and stand on one leg normally."[8] (Doc. 10, p. 329) Plaintiff's neurological examination was normal, as was examination of his extremities including range of motion, handgrip, fine finger movements, finger extension, fist making, pinch grip, and motor strength. (Doc. 10, p. 329) Doctor Gomez was unable to perform a complete examination because he lacked information concerning plaintiff's heart. (Doc. 10, p. 329)

Doctor Deborah Doineau, Ed.D., provided a consultive psychological evaluation of plaintiff on January 24, 2011. (Doc. 10, pp. 332-42) Doctor Doineau noted that plaintiff: 1) had a valid driver's license; 2) liked "fishing and motorcycling but doesn't engage in these activities as much as he did"; 3) liked to "tinker with vehicles"; 4) "complained of trouble concentrating . . . [and] . . . had to make a concerted effort to focus on what he was doing"; 5) often shut the television off before the end of a movie; 6) drove, and was able to go to the store himself, but went to Walmart at night; 7) watched television and the news in the morning. (Doc. 10, pp. 335-36)

Plaintiff presented to the Sumner Regional ER for chest pain the morning of November 29, 2011. (Doc. 10, p. 458) He was hospitalized at Hendersonville Medical Center later that same day. (Doc. 10, pp. 456-63) Plaintiff had a normal EKG, and there was no evidence of acute ischemia.[9] (Doc. 10, pp. 460, 456) He underwent a left heart catheterization on December 1, 2011 (Doc. 10, pp. 464-65), which revealed "diffuse disease with an 80% second diagonal branch stenosis, otherwise mild to moderate diffuse disease throughout with normal left ventricular ejection fraction"

---

[8] The Magistrate Judge notes that, consistent with Dr. Gomez's report in 2011, plaintiff did not check the box labeled "Squatting" as one of the abilities that his "illnesses, injuries, or conditions affect" (Doc. 10, p. 130) in the Adult Function Report that he completed on October 29, 2010 (Doc. 10, pp. 126-133).

[9] Ischemia – "deficiency of blood in a part usually due to functional construction or actual obstruction of a blood vessel." *Dorland's* at p. 961.

(Doc. 10, p. 456).

## B. Transcript of the Hearing

Plaintiff testified upon examination by counsel that he "tried a couple times" to work since his disability onset date in June 2007. (Doc. 10, p. 580) He testified that he "was working construction [o]n the new 109 bypass" September through November 2007 when he lost his balance, fell, and injured his foot "climb[ing] . . . up and down getting equipment . . . ." (Doc. 10, p. 581) He later had surgery on his right ankle, and he claimed that his ankle "swells up and . . . still hurts" when he "walk[s] a long time." (Doc. 10, p. 581) He testified that he tried to work again in 2010 doing "facilities upkeep" work, but the job required him to "walk 10 to 12 hours at night." (Doc. 10, p. 582) He quit "after a while [because he] just couldn't do it no more." (Doc. 10, p. 582)

Plaintiff testified that he had problems with his back. (Doc. 10, p. 582) He testified that he could "lift nothing hardly," had back pain "[t]o an extent" all the time in his lower back and left leg, and his pain was worse when standing and walking. (Doc. 10, pp. 582-83) Plaintiff testified that he had back pain in his back "most all the time" and, on a scale of one to ten, he rated his average back pain as a "[f]ive or a six" without his medication. (Doc. 10, p. 591) When asked if he still had "a mild limp," plaintiff replied, "I'm not going to say it gets worse, unless I do a whole lot of walking . . . [and then his] . . . foot start[ed] hurting." (Doc. 10, p. 592) When asked if he had to "any issues with needing more than normal breaks for whatever reason" when "work[ing] th[e] two times since '07," plaintiff replied, "[j]ust my back and leg." (Doc. 10, p. 592)

Plaintiff testified that he had diabetes, and that the "main" problems it caused were with his feet, eyes, and "tingling" in his arms, hands, and fingers. (Doc. 10, p. 583) His medication made him feel as if he had "been drinking," and he did not have "good balance or coordination no more." (Doc. 10, p. 583) Plaintiff also testified that he was unable to hold things because his grip "was not

as good as it was," and he was unable to see things close up such as when having "to sign . . . papers or read anything . . . ."  (Doc. 10, p. 584)  When counsel asked: "Have you had your eyes checked lately," plaintiff replied that he did not have the money to have them checked, and he did not have health insurance because he was "not insurable."  (Doc. 10, p. 584)

Plaintiff testified that two stents were implanted in his RCA and that, although his heart problems were controllable "[a]s long as [he] stay[ed] on [his] medication," sometimes his heart became "irregular but . . . they've got that pretty much" under control.  (Doc. 10, p. 585)  The main problem with his heart was, if he did "anything strenuous," his arm would hurt and his chest became tight.  (Doc. 10, p. 585)  He testified further that the nitroglycerine patches gave him "severe headache[s]" which, if he were "not careful," made make him dizzy and caused him to fall.

Plaintiff testified that he took medication to control his blood pressure.  (Doc. 10, p. 586)  He later testified when asked if he had "to go to the restroom more than [he] used to" that he needed to use the restroom "probably 10, 12 times or more."  (Doc. 10, p. 592)

Counsel asked plaintiff "[h]ow long can you sit comfortably?"  (Doc. 10, p. 585)  Plaintiff replied, "Not long. . . .  I really don't know."  (Doc. 10, p. 586)  When asked if walking caused him any problems, plaintiff replied "if I walk a long way . . . ."  (Doc. 10, p. 586)  Plaintiff testified that he could not watch a 30 min. television program comfortably "without having to change positions." (Doc. 10, p. 586)

Plaintiff testified that his feet became numb and his legs hurt when he lay down at night, and that his hands, ankles, and feet would be swollen when he awoke in the morning.  (Doc. 10, pp. 586-87)  He testified that the swelling abated "through the day."  (Doc. 10, p. 587)

Plaintiff testified that he rarely finished watching movies on television because he was unable to concentrate.  (Doc. 10, p. 589)  He also testified that he "probably" could concentrate 30

to 45 mins. at a time, but if it "t[ook] very long [he] just h[ad] to leave it."  (Doc. 10, p. 589)

When asked how much weight he could lift "comfortably," plaintiff replied "35 pounds, something like that."  (Doc. 10, p. 589)  When asked if he could "do that all day," he replied, "No, ma'am."  (Doc. 10, p. 589)  Plaintiff later explained that he "carried a bag of dog food the other day and . . . wouldn't have been able to do it again."  (Doc. 10, p. 590)  When asked if he could "squat using [his] knees and pick up something off the floor," plaintiff replied that he could, but had pain when he stood.  (Doc. 10, p. 590)

The ALJ then questioned plaintiff, and asked him when he last worked.  (Doc. 10, pp. 592-95)  Plaintiff responded that he worked at "Econo Auto Painting" for about 6 months in 2012 – Monday through Friday from 7:30 a.m. to 5:30 p.m. from January to June – but he quit 4 months prior to the hearing.  (Doc. 10, pp. 592-93)  Plaintiff started out sanding cars, but when he "couldn't do that no more . . . he went . . . to assistant manager."  (Doc. 10, p. 593)  When asked why the job ended, plaintiff testified that "[t]he fumes of the paint was bothering me, my heart and stuff, and plus, we had a big turnover. . . .  [T]hey hired people that didn't know their job or didn't know what to do . . . ."  (Doc. 10, pp. 593-94)  Plaintiff went on to testify, "I have a very short tolerance for – I wasn't a good manager, I'll put it that way. . . .  I expected things to be perfect . . . [and] . . . in my head I knew these people couldn't do it . . . I just quit . . . it was best for me . . . my nerves couldn't take it."  (Doc. 10, p. 594)

Plaintiff testified that, before working at Econo Auto Painting, he worked at "Patents" in 2010 for "two or three months."  (Doc. 10, pp. 595-97)  "Patents" "ship[ped] stuff from different . . . distribution centers . . . ."  (Doc. 10, pp. 595-96)  Plaintiff worked from 4:30 a.m. until 12:00 p.m., Monday through Friday, "clearing" the aisles "for the pickers to run their forklifts."  (Doc. 10, pp. 596-97)  The job required "steady walking"  (Doc. 10, p. 596), and he quit after he "couldn't . . .

9

walk . . . from [his] vehicle to the door hardly." (Doc. 10, p. 597)

Plaintiff testified that he worked as a self-employed auto mechanic in 2009. (Doc. 10, pp. 597-99) He testified that he worked for the owner of a car lot "whenever he had something to do . . . if he had a car that needed fixed," including the removal and replacement of engines. (Doc. 10, p. 598) Although plaintiff could not "remember that far back,' he testified that he worked for the owner "[m]aybe a couple times a month." (Doc. 10, p. 598)

The ALJ asked plaintiff about his work in 2007 with Elmore Greer and Sons construction, where he was working when he injured his ankle. (Doc. 10, pp. 599-600) The ALJ asked plaintiff if he tried to go back to work after his ankle healed. Plaintiff replied: "They is just done – just about done with the job." (Doc. 10, p. 600)

The ALJ asked plaintiff about his work in 2007 with Clear View Contractors (Clear View). (Doc. 10, pp. 600-02) Plaintiff testified that he worked for Clear View as an on-the-job supervisor of crews "t[aking] care of . . . billboard signs." (Doc. 10, p. 600) Plaintiff added that he "was out of town all the time, but that didn't bother me. But they went out of business" (Doc. 10, p. 601)

Finally, the ALJ asked plaintiff about his job at UniPress where he injured his ankle in 2005. Plaintiff responded that he worked in the press department, "stamping out car . . . [and] . . . truck parts." (Doc. 10, p. 602)

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine

whether an individual is "disabled" within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014).  While the

claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner

at step five to identify a significant number of jobs in the economy that accommodate the claimant's

residual functional capacity (RFC) and vocational profile.  *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d

646, 651 (6th Cir. 2011).

The ALJ determined that plaintiff had the RFC to perform light work with postural and

environmental limitations shown below:

> After careful consideration of the entire record, the undersigned finds
> that the claimant has the residual functional capacity to perform light
> work . . . except he cannot climb ladders and cannot more than
> occasionally climb stairs, balance, stoop, kneel, crouch or crawl.  He
> must avoid concentrated exposure to temperature extremes and must
> be able to briefly alternate sitting and standing every 30 minutes.  He
> is limited to simple repetitive work and cannot have more than
> occasional interaction with others.

(Doc. 10, p. 16)(bold omitted)  The ALJ determined that plaintiff had the RFC to work as a shipping

clerk, hand material mover, inspector and sorter, and hand packager.  (Doc. 10, p. 22)

## III.  ANALYSIS

### A.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining

whether the Commissioner's decision is supported by substantial evidence in the record, and

whether the decision was made pursuant to proper legal standards.  42 U.S.C. § 405(g); *Gayheart*,

710 F.3d at 374.  Substantial evidence is less than a preponderance but more than a scintilla; it refers

to relevant evidence that a reasonable mind might accept as adequate to support a conclusion.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708,

722 (6th Cir. 2003).  The Commissioner's decision must stand if substantial evidence supports the

conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710

F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial

evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006).

**B. Claims of Error**

**1. Whether the ALJ's Determination That Plaintiff
Had the RFC to Perform Light Work Was
Supported by Substantial Evidence
(Doc. 15, pp. 19-21)**

Plaintiff argues first that the ALJ erred in "refus[ing] to accept" Dr. Terry's opinion under

the treating physician rule. This argument is addressed below at pp. 21-23 in plaintiff's second

claim of error. Plaintiff also argues that: 1) the ALJ "failed to notice that he ha[d] no insurance"

(Doc. 15, pp. 19-20); 2) he "mentioned" to his primary care physician "several times" that he

suffered from back pain (Doc. 15, pp. 19-20); 3) the November 2005 MRI of his lumbar spine

revealed that "his back still contains issues from which foreseeable pain and range of motion issues

may flow" (Doc. 15, p. 20); 4) although he can sit for 30 minutes to watch television, he is unable

to watch a movie through to conclusion (Doc. 15, p. 20); 5) he cannot not concentrate for more than

30-45 mins (Doc. 15, p. 20); 6) he "suffers pain when trying to rise" from a squat (Doc. 15, p. 20).

As to plaintiff's argument that the ALJ "failed to notice" he had no insurance, the record

shows that plaintiff received continuous medical care/medications from 2004 through 2012.

Inasmuch as the record shows that plaintiff's access to medical care was not adversely affected by

a lack of insurance, and absent any factual allegations to the contrary, any error on the ALJ's part

in not mentioning plaintiff's lack of insurance is harmless.

Plaintiff refers to 3 specific clinical reports in support of his argument that he reported back

pain "several times" to his primary care physicians. The records to which plaintiff refers are dated

March 21 and 22, 2005, and November 17, 2008. (Doc. 10, pp. 202, 299, 308)  The March 2005 progress notes were written by Drs. Littell and Ponce the week following plaintiff injuring his back, and 3-plus months prior Dr. Terry performing back surgery.  These records predate plaintiff's alleged disability onset date, and are not relevant to plaintiff's post-back-surgery ability to work. The November 17, 2008 progress note was written by Dr. Ponce.  It alone of the three is relevant.

It is appropriate to note here that the ALJ minced no words when he wrote the following characterization of plaintiff's credibility regarding his alleged limitations and symptoms:

> I did not find claimant to be a credible witness.  Claimant's failure to report his 2012 work activity prior to his hearing or to mention that work activity during his detailed direct testimony suggests that he intended to conceal that very substantial and very recent work. Claimant's detailed testimony regarding the side effects from his various medications is inconsistent with the absence of any mention of adverse side effects in Claimant's treatment records.  There is no evidence of any change in claimant's condition since June 2012.  His testimony regarding his limitations was not consistent with his full time employment as an auto sander and as an Assistant Manager until June 2012.  His allegations of loss of vision are inconsistent with his report to Dr. Gomez of no retinopathy and his admissions to Dr. Doineau of daily activities which include driving and watching television. The claimant's inconsistencies suggest that his limitations have been exaggerated.

(Doc. 10, p. 21)

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference . . . ."  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)(citation omitted).  The Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'"  *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(citation omitted).  Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed.Appx. 370, 371 (6th Cir. 2011)(citation omitted).

Turning to the specific argument at hand, plaintiff complained of back pain only once in the years that followed his back injury, *i.e.*, in the November 2008 report written by Dr. Ponce. One time is not "several times." Moreover, as noted above at p. 3, all of Dr. Ponce's subsequent records showed that plaintiff's musculoskeletal system, including his back, was within normal limits.

In addition to the foregoing, the medical evidence of record shows that the MRI to which Dr. Terry referred in November 2005, noted above at p. 4, was unremarkable for nerve compression. This MRI is the only objective medical evidence in the record pertaining to plaintiff's back after his surgery. Several years later, in his January 2011 consultive examination, Dr. Gonzales reported "no tenderness to palpation of the lumbar spine," and that plaintiff's back had "full range of motion." Plaintiff's alleged limitations due to back pain also are belied by his significant work history after his back surgery in 2005. Equally important, none of the several jobs plaintiff held after his back surgery ended because of back problems.

The ALJ's determination that plaintiff exaggerated his limitations, including those attributable to back pain, is supported by substantial evidence.

Plaintiff argues next that the ALJ did not address the November 18, 2005 MRI that plaintiff claims establishes "foreseeable pain and range of motion issues," or his alleged 30 min. sitting limitation. While it is true that the ALJ did not address the MRI directly, the ALJ did include the MRI at issue in the RFC as shown by the following statement in the decision: "The limitations included in the residual capacity provide for a **remote back surgery** with no follow-up treatment and no visits to a pain specialist." (Doc. 10, p. 17)(emphasis added) "[R]emote back surgery" refers to plaintiff's 2005 back surgery. As for the 30 min. sitting limitation, as shown above at p. 11, the ALJ included that limitation in the RFC. These two arguments are without merit.

Although the ALJ did not address plaintiff's alleged inability to concentrate for more than

30-45 mins. as plaintiff argues, as noted above at p. 13, the ALJ did determine that plaintiff's "testimony regarding his limitations was not consistent with his full time employment as an auto sander and as an Assistant Manager . . . [which] . . . suggest[ed] that his limitations have been exaggerated." Plaintiff's limitations include his alleged difficulty concentrating. Inasmuch as plaintiff would have had to have been able to concentrate for more than 30–45 mins. to perform either of these jobs, as well as any of the several other jobs that plaintiff had subsequent to his disability onset date, the ALJ's failure to mention plaintiff's alleged inability to concentrate is harmless. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)([H]armless error analysis applies to credibility determinations . . . .").

Plaintiff argues next that "he can squat but suffers pain when trying to rise." Plaintiff's single-sentence, naked assertion fails to provide any supporting factual allegations.

The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, this argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Although plaintiff's squatting argument waived, the Magistrate Judge notes for the record that substantial evidence supports the conclusion that, as with his other alleged limitations, plaintiff exaggerated this one as well. As noted above at p. 6 n. 8, plaintiff did not check the box in the Adult Function Report he completed in 2010 that his ability to squat was limited by his alleged conditions and, as previously noted above at p. 6, Dr. Gomez

reported in 2011 that plaintiff squatted "normally."

Plaintiff argues next that Dr. Gomez was unable to assess him fully without more information concerning his heart, and that the ALJ erred in not ordering such an exam.  Plaintiff was represented by counsel in the proceedings below.  The ALJ has no duty to develop the record where, as here, the claimant was represented by counsel.  *See Bass v. McMahon*, 499 F.3d 506, 514 (6th Cir. 2007); *see also Culp v. Comm'r of Soc. Sec.*, 529 Fed.Appx. 750, 751 (6th Cir. 2013)(citing *Duncan v. Sec'y of Health and Huyman Servs.*, 801 F.2d 847, 856 (6th Cir. 1986)).  This argument is without merit.

Plaintiff argues next that he "becomes short of breath with and without exertion," he has two stents in the RCA, has been hospitalized for premature ventricular contractions, and wears a nitroglycerin patch because his "Arm hurts and chest gets tight if he does anything strenuous . . . ."  The ALJ addressed plaintiff's heart issues in detail.  (Doc. 10, p. 18)  Plaintiff, on the other hand, does not argue what, if anything, the ALJ did, or failed to do, that constituted error that, had the ALJ done otherwise, would have resulted in a different outcome.  Absent any factual allegations to guide the court in its analysis, this argument is waived.

Here too, there is substantial evidence on the record that plaintiff exaggerated his heart-related limitations/symptoms.  As noted above at pp. 6-7, plaintiff underwent a left heart catheterization in December 2011 that was positive for heart disease.  However, plaintiff testified that he worked for several months in 2012 in an auto body shop, not quitting until just a few months prior to the hearing.  Although plaintiff testified that he quit that job because of his "heart and stuff," his testimony shows that he actually quit because he had "short tolerance" for the work of those under his supervision and, as such, "it was best" for him.  The ALJ made the specific determination that this particular employment showed plaintiff was exaggerating his limitations.

Finally, plaintiff argues that: 1) he is an insulin dependent diabetic who has trouble controlling his diabetes; 2) diabetes-related drugs have not helped and "make him sick"; 3) he has neuropathy in his hands that cause tingling and numbness in his hands several times a day; 4) he has a "mild eye problems and erectile dysfunction"; 5) and diuretics in his medications "probably cause need for 10 to 12 bathroom breaks during [the] workday." (Doc. 15, p. 21)

Under the regulations, "to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. . . . If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . ." 20 C.F.R. § 404.1530(a)-(b).

The ALJ wrote the following with respect to plaintiff's insulin-dependent-diabetic argument:

> . . . . In October of 2008, the doctor noted that the claimant was economizing on his insulin,' and therefore his 'diabetes [wa]s not under good control.' In April of 2009, a note was made . . . 'Doing fine on current med. Except BS medicine. BS does run high every month! Not taking Metformin. No side effects per patient.' The claimant cancelled appointments in August, September, October and November of that year. . . . In June of 2010, across the progress note form, similar to those used in previous visits, there was handwritten in bold letters, 'Pt. left w/out being seen[.] Did not want to wait. (There was only 1 Pt. in front of him and it was a quick sick recheck.)' Several months later, in October, Dr. Ponce wrote in office notes that the claimant had not been taking insulin as directed. . . . Records from July 2011 report, '*he is not fully compliant*,' which is just a repeat of an earlier comment made in January of 2011, '*not the most compliant pt.*'. . . [H]is failure to take insulin as directed and general, repeated failure to be compliant with treatment, suggest that the limitations imposed by the diabetes are less severe than alleged. . . .

(Doc. 10, pp. 18-19)(italics in the original) The records of Drs. Littell and Ponce support the ALJ's conclusion above that plaintiff was noncompliant with treatment prescribed for his diabetes. The next question is whether plaintiff has provided a "good reason" for not doing so.

Plaintiff argues that his diabetes medications did not work, and that they made him sick.

The Magistrate Judge concludes *a priori* that plaintiff's diabetes medications did not work because he did not take them as prescribed. As for making him sick, apart from Dr. Ponce's March 24, 2009 progress note, above at p. 3, there are no other entries in the medical records of plaintiff complaining that his diabetes medications made him sick. He did not tell Dr. Gomez during his consultive examination that they did, nor did he testify at the hearing that they did. Moreover, plaintiff listed his medications in the Adult Function Report dated October 29, 2010. (Doc. 10, p. 133) Although he noted that some of his medications made him feel tired, run down, and weak, he did not report that any of them made him sick. (Doc. 10, p. 133) As for the specific claim that Metformin makes him sick, the same Adult Function Report shows that he was not taking Metformin at least as early as October 29, 2010 (Doc. 10, p. 133), *i.e.*, the same month he filed for benefits, nor did he report that he was taking Metformin in the May 23, 2011 Disability Report on appeal (Doc. 10, p. 152). Finally, even if his medications had adverse side effects, those effects were not so severe that he was unable to work on the several occasions that he did, nor did he quit any of those jobs for reasons related to his diabetes and/or medications for his diabetes.

Substantial evidence shows that plaintiff is not entitled to relief under 20 C.F.R. § 404.1530(a)-(b) because he did not follow his prescribed treatment for diabetes, nor has he provided a good reason for having not done so. Therefore, plaintiff's argument that he is entitled to benefits because of his diabetes is without merit.

Plaintiff's remaining factual allegations, *i.e.*, neuropathy, vision, erectile dysfunction, and frequent need to urinate, 3) through 5) above at p. 17, appear to be related to plaintiff's diabetes. To the extent they are, further analysis is not required as those symptoms/limitations are part and parcel to the previous analysis of plaintiff's overarching diabetes argument. To the extent that they may not be related solely to plaintiff's diabetes, the Magistrate Judge will address them for the sake

of completeness.

Plaintiff does not provide any references to the record to support his claim that he has tingling and numbness in his hands due to neuropathy. A review of the record shows that plaintiff complained of neuropathy-related symptoms only twice – once in May 2008 and again in January 2009. (Doc. 10, pp. 296, 306) The remainder of the record is devoid of any medical evidence that would support this argument. Additionally, the state's consultive examiner, Dr. Gomez, made no mention of neuropathy, tingling and/or numbness, or that plaintiff complained of any neurological problems. Doctor Gomez's neurological examination of plaintiff was entirely normal, as was his examination of plaintiff's extremities including range of motion, handgrip, fine finger movements, finger extension, fist making, pinch grip, and motor strength. Plaintiff's extensive employment history supports the conclusion that, even if he did have tingling and/or numbness in his hands, his symptoms were not so severe as to prevent him from doing a broad range of full-time work when he chose to work, nor did numbness and tingling in his hands ever constitute a reason for quitting any of those jobs. Substantial evidence supports that conclusion that plaintiff exaggerated his limitations/symptoms of neuropathy.

As to plaintiff's "mild eye problems," the law is well established that minor nonexertional limitations such a plaintiff's "mild eye problems" are not enough to entitle plaintiff to benefits. *See Kimbrough v. Sec'y of Health and Human Serv's*, 801 F.2d 794, 796 (6th Cir. 1986). Moreover, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.00.A.4 provides the following with respect to evaluating plaintiff's alleged visual disorder:

> To evaluate your visual disorder, we usually need a report of an eye examination that includes measurements of your best-corrected central visual acuity . . . or the extent of your visual fields . . . appropriate. If you have visual acuity or visual field loss, we need documentation of the cause of the loss. A standard eye examination will usually indicate the cause of any visual acuity loss. A standard

eye examination can also indicate the cause of some types of visual
field deficits.

There are no eye examinations in the medical record. As plaintiff was represented by counsel in the proceedings below, it was his responsibility to provide the results of a vision test to support this claim. Plaintiff's "mild eye problems" argument is without merit for the reasons stated above.

In addition to the foregoing, the record shows that plaintiff admitted to Dr. Doineau that he liked to ride motorcycles, that he liked to "tinker with vehicles," that he was able to drive himself to the store, and that he watched television and the news. All of these activities require the ability to see. More importantly, state law requires drivers to meet specific vision requirements to hold a valid driver's license. Given that plaintiff admitted to Dr. Doineau that he had a valid driver's license, and given his claim that he is unable to pay to see an eye doctor, it is fair to conclude that plaintiff passed the state's vision requirements for a driver's license without benefit of corrective lenses. Plaintiff reported additionally in the October 29, 2010 Adult Function Report that he pays bills, and can use a checkbook. (Doc. 10, p. 128) Plaintiff's ability to pay bills and use a checkbook is contrary to his testimony that, "if I have to sign any papers or read anything I can't do it." (Doc. 10, p. 584) Finally, plaintiff reported in the October 2010 Adult function report that his alleged illnesses, injuries, and/or conditions do not affect his ability to see (Doc. 10, p. 130), and that he used reading glasses to read, but they were not prescription glasses (Doc. 10, p. 132). Both admissions illustrate plaintiff's disingenuousness regarding this claim in the proceedings below.

Plaintiff has not explained how his alleged erectile dysfunction is disabling, or how this alleged condition and/or associated symptoms qualify him for benefits. Suffice it to say, however, that none of the jobs the ALJ determined plaintiff was capable of performing, noted above at p. 11, require the proper functioning of the part of the anatomy at issue. Plaintiff's alleged erectile dysfunction also does not appear to have affected his ability to perform the substantial work he has

engaged in since 2007, nor did plaintiff leave those jobs for related reasons. This argument simply is not credible, and borders on frivolous.

Finally, although plaintiff testified his medications require that he urinate 10 to 20 times daily, apart from his testimony, there is nothing in the record to support that argument. As previously noted above at p. 18, plaintiff listed his medications in the October 29, 2010 Adult Function Report. (Doc. 10, p. 133) Although plaintiff notes that some of his medications make him tired, feel run down, and weak, plaintiff does not assert that any of his medications cause him to have to urinate frequently, much less 10 to 12 times a day. Even if plaintiff's medications caused him to urinate more frequently than normal, the alleged need to urinate frequently did not, once again, affect his ability to perform the work he admitted to having performed subsequent to his disability onset date, nor did he claim that frequent urination was the reason he was unable to continue working in those jobs. Substantial evidence supports that the conclusion that plaintiff once again exaggerated his limitations/symptoms.

For the reasons explained above, the ALJ did not err in determining that plaintiff had the RFC to perform light work. Therefore, plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Erred in Not Giving Controlling Weight to the Records of Treating Physician Dr. Terry (Doc. 15, pp. 21-22)

Plaintiff argues that the ALJ erred in not giving controlling weight to Dr. Terry. Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d 376 (6th Cir. 2013)(quoting 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by a treating physician's

opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health & Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994). However, the Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

The ALJ wrote the following in his decision pertaining to Dr. Terry's treatment of plaintiff in 2005:

> I note the opinion of Dr. Roy Terry on November 15, 2005, concluding that claimant was permanently restricted to work with no repetitive bending or twisting following his July 2005 back surgery. I do not give significant weight to that opinion for several reasons. First, it is vague and ambiguous. Second, it does not appear that Dr. Terry treated claimant any time after November 15, 2005. Finally, after the opinion was offered claimant demonstrated his ability to perform full time work as a heavy equipment operator, as a janitor, as a[n] automobile sander, and as an Assistant Manager.

(Doc. 10, p. 19)

As an initial matter, the Magistrate Judge notes that the relevant time frame in this action is the time between the alleged onset date and the date last insured, *Broughton v. Comm'r of Soc. Sec.*, 2013 WL 1412333 * 2 (E.D. Ky., 2013), in this case, the period between June 15, 2007 and September 30, 2009. This court has previously held that the ALJ did not err in not considering the opinion of a treating physician who did not treat the claimant during the relevant time. *Litteral v. Colvin*, 2014 WL 6997889 * 17 (M.D. Tenn. Dec. 30, 2014, Nixon, SJ). Absent any authority to the contrary, the ALJ was not required to consider Dr. Terry's opinion because there is no bridge between it and the relevant period at issue.

Notwithstanding the foregoing, the Magistrate Judge will address the ALJ's explanation directly. First, Dr. Terry's opinion is, in fact, vague and ambiguous. Doctor Terry released plaintiff to his "regular duty type work," but restricted plaintiff from any "repetitive bending or twisting." One cannot perform "regular duty type work" as a press operator stamping out car and truck parts without engaging in repetitive bending and twisting. Second, Dr. Terry did, in fact, not treat plaintiff in the 1½ years between his November 15, 2005 report and plaintiff's initial onset date, or at any time thereafter. Finally, the ALJ did not err in viewing Dr. Terry's opinion in the context of plaintiff's subsequent employment as on-the-job supervisor for billboard maintenance, in heavy construction, as an independent auto mechanic, in "facilities upkeep," and in an automotive paint shop a mere 4 months prior to the hearing.

As shown above, the ALJ gave good reasons for discounting Dr. Terry's 2005 medical opinion, and his reasons are supported by substantial evidence. Moreover, not only would the ALJ's reasoning be clear to subsequent reviewers, any subsequent reviewer would agree with the ALJ's decision. Plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in Not Considering the Combined Effects of all Plaintiff's Impairments (Doc. 15, pp. 22-24)

Plaintiff argues that the ALJ failed to consider the combined effects of all his impairments. Plaintiff lists the following impairments that the ALJ should have considered: 1) impairment from a right ankle injury; 2) anxiety/depression; 3) back pain and loss of function; 4) ischemic heart disease; 5) neuropathy; 6) vision issues; 7) insulin dependent diabetes; 8) difficulty concentrating; 9) problems with his medications; 10) limitations on his ability to bend and twist; 11) the need for additional unscheduled breaks. (Doc.15, pp. 23-24)

The ALJ is required to consider the combined effects of a claimant's impairments in making

his disability determination. However, "[a]n ALJ's individual discussion of multiple impairments does not imply that he failed [he] failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet' a listed impairment." *Hill v. Comm'r of Soc. Sec.*, 560 Fed.Appx. 547, 551 (6th Cir. 2014)(quoting *Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)(citing *Gooch v. Sec'y of H.H.S.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)).

The ALJ determined at step 2 that plaintiff had the following severe impairments: 1) residuals from his back surgery; 2) coronary artery disease; 3) diabetes; 4) obesity; 5) residuals from his right ankle surgery; 6) general anxiety disorder. (Doc. 10, p. 15) The ALJ then stated at step 3 that plaintiff did "not have an impairment or <u>combination of impairments</u> that meets or medically equals the severity of one of the listed impairments . . . ." (Doc. 10, p. 15)(bold omitted, underline added) The ALJ then went on to discuss each and every alleged limitation enumerated above at p. 23, following which the ALJ made his RFC determination based on "careful consideration of the entire record." (Doc. 10, p. 16) Finally, the ALJ's final decision was based upon "careful consideration of all the evidence." (Doc. 10, p. 12)

Plaintiff cites *Gooch* with approval in his brief. The *Gooch* court found no error where, as here, the ALJ: 1) "specifically referred to 'a combination of impairments' in deciding that Mr. Gooch did not meet one of the listings"; 2) used the expression "these 'impairments (plural)'" in describing his consideration of the claimant's individual impairments; 3) used the expression "'[b]ased upon the medical evidence' as a whole" following "his canvass of all of the individual impairments"; 4) concluded by noting "'[a]fter consideration of the entire record' (emphasis supplied)." *Gooch*, 833 F.2d at 592 (parenthetical statements in the original). The ALJ's decision in this case tracks with *Gooch*. Plaintiff's third claim of error is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 6th day of August, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge